UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 23-cr-00245 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| LUTHER WILLIAMS JR (01)<br>GERMANY SIMPSON (02) | MAGISTRATE JUDGE HORNSBY |

### REPORT AND RECOMMENDATION

**Introduction**

Before the court is a Motion to Suppress filed by defendant Luther Williams ("Williams") (Doc. 45). The motion was adopted by defendant Germany Simpson ("Simpson"). For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

A hearing was held on the motion to suppress. The following facts were established. TFO Shawn Jenkins is a Webster Parish Sheriff's Deputy and participates in a task force with the DEA. Task force officers received information that defendant Williams was distributing Fentanyl pills. The officers generated a confidential source ("CS") to perform controlled buys from Williams. The CS conducted four controlled buys between April and July 2023. Jenkins applied for a search warrant for Williams' address, 18601 Millicent Way, #209 ("the Millicent apartment"). The probable cause affidavit detailed the four controlled purchases of narcotics.

The first controlled purchase took place in April 2023. Jenkins and TFO Rick Anderson met with the CS and searched him and his vehicle. The CS made a recorded

phone call to Williams and arranged to meet Williams at the Brookshires grocery store on Line Avenue to purchase 30 units of Fentanyl for $525. The officers provided the CS with recording devices and currency to pay for the Fentanyl. The officers followed the CS directly to the Brookshires. TFO Keith Knox joined Jenkins and Anderson to observe the purchase.

Williams arrived at the Brookshires in a blue Audi. The officers queried the license plate on the Audi and found that the vehicle was registered to defendant Simpson, whose address was listed as the Millicent apartment. The officers saw Williams sitting in the driver's seat of the vehicle and a female in the passenger seat. The CS entered the Audi and exited a few minutes later. The CS and the Audi left the parking lot, and the officers followed the CS to a pre-arranged meeting location. The CS gave the officers a plastic baggie containing suspected Fentanyl pills. The CS told the officers that the Audi belonged to Williams' girlfriend, who was the passenger in the vehicle. TFO Knox identified the passenger as defendant Simpson.

Before the second controlled buy, officers conducted surveillance on the Millicent apartment. Officers located two vehicles associated with Williams at the apartment: the blue Audi registered to Simpson and a brown Lexus. Based on their surveillance, the officers believed that Williams and Simpson lived together in the apartment.

The second controlled buy took place on May 11, 2023. The CS arranged to buy one hundred Fentanyl pills. Officers met with the CS at a pre-arranged location, and the CS texted Williams about purchasing the Fentanyl pills. Williams agreed to sell the pills to the CS. Williams told the CS he needed to go get the pills and agreed to meet the CS at

the Brookshires grocery store parking lot in 20 minutes. TFO Chris Hembree was conducting surveillance at the Millicent apartment, and he saw Williams and Simpson leave the apartment complex together in the brown Lexus. Williams and Simpson stopped at a Thrifty Liquor store before going to the Brookshires. The CS met the two defendants at the Brookshires and purchased the Fentanyl from them in a recorded transaction. The officers searched the CS for contraband before and after the controlled purchase.

The third controlled buy took place on May 31, 2023. Officers conducted surveillance on the Millicent way apartment, and they saw the brown Lexus and blue Audi in the parking lot. TFO Jenkins and TFO Anderson met the CS at a prearranged location. The CS contacted Williams and arranged a purchase of 100 Fentanyl pills from Williams at the Club 4 Fitness Gym in Shreveport. Williams told the CS he would be on his way to meet him in 20 minutes. A few minutes later, officers saw Williams and Simpson exit the apartment and get into the Lexus. The officers followed Williams and Simpson directly from the apartment to the gym parking lot. The CS got into the Lexus and purchased 100 Fentanyl pills from Williams in a recorded transaction. The officers searched the CS for contraband before and after the controlled purchase.

The fourth buy took place on July 13, 2023. Officers surveilling the Millicent apartment saw Williams get into a white Toyota Camry to meet with one of his known narcotics associates. After sitting in the Toyota, Williams got back into his Lexus to park then went upstairs into the Millicent apartment. Officers met with the CS at a prearranged location, and the CS sent Williams a text message to inquire about purchasing Fentanyl. Williams agreed to meet the CS at Walmart and sell him 30 Fentanyl pills. Agents watched

Williams get back into the Lexus and travel directly to the Walmart. The CS arrived at the Walmart parking lot and parked next to Williams. The CS got into the Lexus and purchased the Fentanyl in a recorded transaction. As with the other transactions, officers searched the CS for contraband both before and after the purchase.

After the agents applied for and procured the search warrant for the Millicent apartment, they prepared for a search of the apartment. On July 20, 2023 a deputy performed a traffic stop on Williams and Simpson after observing a traffic violation. Following the stop, officers transported Williams and Simpson to the Millicent apartment and executed the search warrant. The search yielded 1295 Fentanyl pills, a .38 caliber firearm, marijuana, suspected MDMA pills, and approximately $80,000 in cash.

**The Motions to Suppress**

Defendants Williams and Simpson argue that the search warrant for the Millicent apartment lacked probable cause because the officers did not establish a fair probability that evidence or contraband would be found at the Millicent apartment. Defendants argue that the good faith exception does not apply to the warrant because it is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

**Law and Analysis**

To determine whether a search warrant violates the Fourth Amendment, the Fifth Circuit applies a two-part inquiry. United States v. Allen, 625 F.3d 830, 835 (5th Cir. 2010). First, does "the seizure fall within the good-faith exception to the exclusionary rule?" Id. If the good-faith exception does not apply, the second question asks whether

the issuing judge "had a substantial basis for believing there was probable cause for the search." Id.

In this case, the court need not reach the second step because the good-faith exception applies. Under the good faith exception, if an officer's 'reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues [is] objectively reasonable,' a court need not suppress the fruits of the search. United States v. Flanders, 468 F.3d 269, 271 n. 2 (5th Cir. 2006) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)).

The good faith exception is inapplicable to the execution of a warrant only in the following "exceptional circumstances": (1) when the magistrate issued it in reliance on a deliberately false affidavit; (2) when the magistrate abandons his or her judicial role and fails to perform in a neutral or detached fashion; (3) when the warrant is based on an affidavit so lacking in indicia of probable cause as to render an officer's belief in it unreasonable; and (4) when the warrant is so facially deficient, as by failing to particularize the place to be searched or the items to be seized, that no reasonable officer could believe it valid. Leon, 468 F.3d at 923.

Defendants argue that the warrant in this case was facially deficient because the facts in the affidavit do not establish a nexus to the Millicent apartment that rises to the level of a fair probability that evidence would be found there. Facts in a probable cause affidavit must establish a nexus between the place to be searched and the evidence sought. U.S. v. Payne, 341 F.3d 393, 400 (5th Cir. 2003). The nexus may be established through

direct observation or through "normal inferences as to where the articles sought would be located." Id.

Officers surveilled the defendant and performed four controlled buys over the course of two months. They observed the Williams and Simpson leave from the Millicent apartment in three of those buys. In two of the buys, the officers followed the defendants as they drove directly from the Millicent apartment to the location where they met the CS. The officers maintained surveillance prior to the CS placing the order for Fentanyl until the controlled buy was complete.

TFO Jenkins detailed these incidents in his affidavit. He carefully explained the agents' observations and why his training and experience led him to believe that there was a fair probability that Williams was keeping illegal drugs in his residence. Jenkins then applied for a federal search warrant. He had no reason to believe the warrant was lacking in indicia of probable cause or that it was facially deficient in any way. Jenkins knew that the magistrate judge had not been misled in any way. Jenkins relied in good faith on his properly obtained federal search warrant as the basis for the search of the target residence described in the warrant.

Accordingly,

It is recommended that Defendants' Motion to Suppress (Doc. 45) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court,

unless an extension of time is granted under Fed. R. Crim. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections.  Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 30th day of July, 2024.

_____
Mark L. Hornsby
U.S. Magistrate Judge